IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WINIFRED J. DAUGHERTY, STEVEN MILLARD, and GLORIA JACKSON, Individually and as representatives of a class of participants and beneficiaries on behalf of the University of Chicago Retirement Income Plan and the University of Chicago Contributory Retirement Plan,<br><br>        Plaintiffs,<br><br>vs.<br><br>THE UNIVERSITY OF CHICAGO,<br><br>        Defendant. | Civil Action No. 1:17-cv-03736<br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

1.      Plaintiffs Winifred J. Daugherty, Gloria Jackson, and Steven Millard, individually and as representatives of participants and beneficiaries of The University of Chicago Contributory Retirement Plan, and The University of Chicago Retirement Income Plan for Employees (the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendant, The University of Chicago, for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2.      The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plans, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries, and to ensure that the Plans' expenses are reasonable and the Plans' investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plans have billions of dollars in assets, the Plans have tremendous bargaining power to demand low-cost administrative

- 1 -

and investment management services and well-performing investment funds.

3.       But instead of leveraging the Plans' substantial bargaining power to benefit participants and beneficiaries, Defendant failed to adequately investigate, examine, and understand the real cost to plan participants for administrative services, thereby causing the Plans and participant investors to pay grossly excessive and unreasonable fees for administrative services.

4.       Rather than negotiating separate, reasonable, and fixed fees for recordkeeping, Defendant continuously retained investment choices and share classes that charged higher fees than other less expensive share classes that were available for the same investment fund.  As a result, plaintiffs paid an asset-based fee for administrative services that continued to increase with the increase in the value of a participant's account even though no additional services were being provided.

5.       Further, Defendant was responsible for regularly monitoring all the Plans' investment choices and for periodically reviewing and evaluating the entire investment choice menu to determine whether it provided an appropriate range of investment choices into which participants could direct the investment of their accounts.  Defendant, however, failed in those duties and retained certain investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive fees.

6.       Defendant selected as the Plans' principal capital preservation fund, an insurance company fixed-income account, the TIAA Traditional Annuity, that prohibited participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment

objectives changed. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

7.       One could reasonably infer from these circumstances alone that the Defendant's fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as (i) the inclusion of a dizzying array of thirty-five TIAA-CREF and more the eighty Vanguard investment options; and (ii) approval of a TIAA loan program that required excessive collateral as security for repayment of the loan, charged grossly excessive fees for administration of the loan, and violated U.S. Department of Labor ("DOL") rules for participant loan programs.

8.       To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of classes of participants and beneficiaries in the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## I.        JURISDICTION AND VENUE

9.       This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331, because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10.      This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b), because it is the district in which the Plans are administered, where the

alleged breaches took place and where the Defendant resides.

## II.    THE PLANS

### A.    The University of Chicago Contributory Retirement Plan

11.    The University of Chicago Contributory Retirement Plan ("CRP") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

12.    The CRP is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

13.    Faculty and staff members of The University of Chicago are eligible to participate in the CRP. The CRP, the only source of retirement plan income for many employees of The University of Chicago, is based upon deferrals of employee compensation, employer matching contributions and performance of investment options net of fees and expenses.

14.    Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With more than **$2.1 billion** in assets, the CRP amply qualifies as a "Mega" plan. The CRP had more than 13,000 participants as of December 31, 2015.

### B.    The University of Chicago Retirement Income Plan for Employees

15.    The University of Chicago Retirement Income Plan for Employees ("ERIP") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

16.    The ERIP is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

- 4 -

17.     Non-academic employees of the University who have one year of service are eligible to participate in the ERIP. The ERIP, the only source of retirement plan income for many employees of The University of Chicago, is based upon deferrals of employee compensation, employer matching contributions and performance of investment options net of fees and expenses.

18.     As of December 31, 2015, there were more than 23,000 participants in the ERIP. With more than $980 million in assets, the ERIP qualifies as a "Large" plan.

## III.     THE PARTIES

### A.     Plaintiffs

19.     Plaintiff Winifred J. Daugherty, a citizen of Illinois, is a Participant in the ERIP as defined in 29 U.S.C. §1002(7). Through the ERIP she is invested in the TIAA Traditional Annuity, TIAA-CREF Stock Fund R3, the CREF Growth Fund R3, the CREF Equity Index R3, the CREF Global Equities Fund R3, the CREF Bond Market Fund R3, and the CREF Inflation-Linked Bond Fund R3.

20.     Plaintiff Gloria Jackson, a citizen of Illinois, is a participant in the ERIP as defined in 29 U.S.C. §1002(7). Through the ERIP she has invested in TIAA Traditional Annuity, CREF Bond Market Fund R3, CREF Money Market Fund R3, and TIAA Real Estate Account.

21.     Plaintiff Steven Millard, a citizen of Illinois, is a participant in the CRP as defined in 29 U.S.C. §1002(7), Through the CRP, he is invested in certain funds offered by TIAA-CREF, including the TIAA Traditional Annuity, TIAA Real Estate Fund, TIAA-CREF Bond Market Fund R3, and CREF Inflation-Linked Bond Fund R3, as well as investments in the TIAA-CREF Lifecycle 2050 Fund, TIAA-CREF Large-Cap Value fund, TIAA-CREF Mid-Cap Value Fund, TIAA-CREF Small-Cap Equity Fund, TIAA-CREF Large-Cap Growth Index Fund, TIAA-

CREF S&P 500 Index Fund, and TIAA-CREF Growth & Income fund.

**B.      Defendant**

22.      The University of Chicago (the "University" or "Defendant") is a non-profit corporation organized under Illinois law with its principal place of business in Chicago, Illinois. The University is governed by a Board of Trustees.

23.      The University is the Sponsor and Administrator of the Plans under 29 U.S.C. §1002(16)(A)(i). As stated in the Summary Plan Description for the ERIP, "[t]he University has all discretionary power and authority necessary to administer ERIP, including, but not limited to, the power and authority to interpret the provisions of ERIP, to compute the amount and kind of benefits payable to participants and beneficiaries, to direct the payment of plan expenses from ERIP, and to resolve any questions relating to eligibility to participate in ERIP. Accordingly, Defendant possesses exclusive and complete discretionary authority to control the operation, management and administration of the Plans, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants.

24.      The University is a fiduciary to the Plans because it exercises discretionary authority or discretionary control respecting the management of the Plans or exercises authority or control respecting the management or disposition of the Plans' assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. *See* 29 U.S.C. §1002(21)(A)(i) and (iii).

**IV.      FACTS APPLICABLE TO ALL COUNTS**

**A.      Plan investments**

25.      Defendant exercised and continues to exercise discretionary authority over the

investment options that are included in the Plans. The Plans' investments are designated by Defendant as available investment alternatives offered under the Plans.

26.    The Plans offer thirty-five investment choices managed by the Teachers Insurance and Annuity Association-College Retirement Equities Fund ("TIAA-CREF"), including annuities, pooled separate accounts and registered investment companies (mutual funds).The Plans also offer more than eighty investment choices managed by The Vanguard Group and/or Vanguard Fiduciary Trust Company ("Vanguard"), which are all mutual funds.

27.    The investment options for the Plans are substantially similar if not identical.

28.    Participants in the Plans may allocate their contributions to TIAA-CREF, Vanguard, or both.

29.    In the aggregate, the University of Chicago Plans hold more than $3 billion in assets.

V.    **DEFENDANT'S FIDUCIARY BREACHES**

   A.    **Defendant caused the Plans to pay excessive amounts for administrative expense**

30.    The Plan's CREF Stock Account, CREF Money Market Account, CREF Social Choice Account, CREF Inflation-Linked Bond Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

31.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional

Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

32.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

33.     The expense ratio for the CREF variable annuity accounts is made up of multiple layers of expense charges. For the R1 share class, which was the only share class available prior to 2015, those expense charges consist of the following:

      a. "administrative expense" charge (39.5 bps); [1]

      b. "distribution expense" charge (16.5 bps);

      c. "mortality and expense risk" charge (0.5 bps); and

      d. "investment management expense" charge (ranging from 4 to 15 bps).

34.     As of December 31, 2014, the aggregate amount invested in the CREF variable annuities by the Plans totaled nearly $920 million. Based on those investments alone, the Plans were paying TIAA more than $5 million annually in administrative expense.

35.     None of that compensation is described or disclosed in the Annual Return for the Plans filed with the DOL on Form 5500 (the "Annual Return"), in violation of DOL regulations.

36.     In addition, based on other disclosures made by TIAA, the Traditional Annuity

---

[1] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

allocates 15 basis points for recordkeeping and administrative services. As of December 31, 2014, the Plans had in the aggregate nearly $740 million invested in the Traditional Annuity, adding another $1.1 million to the amount the Plans paid for recordkeeping.

37.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

        a. "administration" charge (26.5 bps);

        b. "distribution" charge (12.5 bps);

        c. "mortality and expense risk" charge (0.5 bps);

        d. "liquidity guarantee" (17 bps); and

        e. "investment management" charge (32.0 bps).

38.     As of December 31, 2014, the Plans had in the aggregate nearly $60 million invested in the TIAA Real Estate Account, adding another $235,000 to the amount the Plans paid for recordkeeping.

39.     In addition, the TIAA receives additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

40.     Even after the restructuring of the CREF variable annuities, TIAA is receiving approximately $2.5 million from the variable annuities, the TIAA Traditional Annuity and the TIAA Real Estate Account alone, without considering the additional compensation described in

the preceding paragraph and the excessive compensation from TIAA's illegal loan program.

41.     With respect to Vanguard funds, as of April 2017, Defendant provided approximately 87 investment options in Vanguard mutual funds. Such funds include asset classes such as bond funds, balanced funds (stocks and bonds), domestic stock funds, international stock funds, and specialty stock funds like real estate.

42.     The Plans' Vanguard fund offerings include both retail "investor" share classes and "institutional" (or Admiral, depending on the fund) share classes of mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

43.     Of the 87 Vanguard funds available to Plan investors, for fully 70 of those choices, the Defendant has designated only the retail "investor" share class as available investment alternatives offered under the Plans. The other 17 available Vanguard funds offered by the Plans include the institutional or Admiral share classes with substantially lower fees.

44.     As shown by the sampling of those funds in the table below, Defendant could have designated the institutional share class for the designated investment options, as opposed to investor share classes, at substantially lower cost to Plan participants. Such institutional class funds are available to large investors like the Plans.

45.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds, "Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup

of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds."
Thus, it is commonly understood by investment managers of large pools of assets that, for a
retirement plan of the Plans' sizes, if requested, the investment provider would make available
lower-cost share classes for the Plans, if there were any fund that did not individually reach the
threshold.

46.     There is no rational basis for selecting institutional class shares for 17 of the
investment choices and investor class shares for the remaining 70. If a selection of share class
was intended to offset the cost of recordkeeping, it was an exceedingly poor decision.  Even a
cursory analysis of the financial statements for the Plans and the prospectuses for the TIAA-
CREF funds would have demonstrated that Plan administrative expense incurred in connection
with just the variable annuities, the Traditional Annuity and the Real Estate Account increased
from $4.385 million in 2009 to nearly $6 million in 2014; an increase of 37%, despite the fact
that **participation in the Plans declined by 27% during that period.**  Despite the availability
of these far lower-cost options, Defendant selected and continues to retain investment options
with far higher costs. The following table lists examples of the Plans' designation of investor as
opposed to lower-cost institutional classes as investment options with respect to Vanguard
mutual funds:

| EXPENSE RATIO COMPARISON: Vanguard Investor Shares vs. Institutional Shares | | | |
|---|---|---|---|
| INVESTOR SHARES OFFERED BY THE PLANS | EXPENSE RATIO | INSTITUTIONAL SHARES, FOR THE SAME FUNDS, NOT OFFERED BY THE PLANS | EXPENSE RATIO |
| **Bond Funds** | | | |
| Inflation-Protected | 0.20% | Inflation-Protected Securities | 0.07% |

| Securities Inv. (VIPSX) | | Institutional Shares (VIPIX) | |
|---|---|---|---|
| Long-Term Bond Index (VBLTX) | 0.16% | Long-Term Bond Index Institutional Shares (VBLLX) | 0.06% |
| Intermediate-Term Bond Index-Inv (VBIIX) | 0.16% | Intermediate-Term Bond Index-Inst (VBIMX) | 0.06% |
| Intermediate-Term Investment-Grade-Inv (VFICX) | 0.20% | Intermediate-Term Investment-Grade-Adm (VFIDX) | 0.10% |
| Intermediate-Term Treasury-Inv (VFITX) | 0.20% | Intermediate-Term Treasury-Adm (VFIUX) | |
| **Balanced Funds** | | | |
| Vanguard Target Retirement 2020 Fund (VTWNX) | 0.14% | Institutional Target Retirement 2020 Fund (VITWX) | 0.10% |
| Vanguard Target Retirement 2030 Fund (VTHRX) | 0.15% | Institutional Target Retirement 2030 Fund (VTTWX) | 0.10% |
| Vanguard Target Retirement 2040 Fund (VFORX) | 0.16% | Institutional Target Retirement 2040 Fund (VIRSX) | 0.10% |
| Vanguard Balanced Index Fund Investor Shares (VBINX) | 0.22% | Balanced Index Fund Institutional Shares (VBAIX) | 0.07% |
| **Stock Funds** | | | |
| Vanguard FTSE Social Index Fund Investor Shares (VFTSX) | 0.22% | FTSE Social Index Fund Institutional Shares (VFTNX) | 0.12% |
| Vanguard Small-Cap Growth Index Fund Investor Shares (VISGX) | 0.20% | Small-Cap Growth Index Fund Institutional Shares (VSGIX) | 0.07% |
| Vanguard Small-Cap Value Index Fund (VISVX) | 0.20% | Small-Cap Value Index Fund Institutional Shares (VSIIX) | 0.07% |
| **International** | | | |
| Vanguard Emerging Markets Stock Index – Inv (VEIEX) | 0.32% | Vanguard Emerging Markets Stock Index-Inst (VEMIX) | 0.11% |
| Vanguard European Stock Index-Inv (VEURX) | 0.26% | Vanguard European Stock Index-Inst (VESIX) | 0.08% |

47.     It is not yet clear to Plaintiffs what the additional fees paid to Vanguard actually

paid for, since it appears that TIAA is the sole recordkeeper.

48.     Based on information currently available to Plaintiff regarding the Plans' features,

the nature of the administrative services provided by the Plans' recordkeepers, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $850,000 (approximately $35 per participant with an account balance).[2]

49.     An examination of the prospectuses for the TIAA and CREF funds available as investment choices and the Plans' financial data, it is clear that the Plans paid at least hundreds of dollars per participant per year from 2010 to 2015 for recordkeeping; much higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

50.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[3] Even if participants pay only 25 basis points in excessive fees over a thirty-five-year period, it would mean the difference between receiving 12 monthly benefit payments a year and eleven.

**B.      Defendant imprudently retained historically underperforming Plan investments.**

51.     Given Defendant's failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were otherwise readily available to the Plans.

**1.      CREF Stock Account**

52.     The CREF Stock Account is one of the largest (by asset size) investment options

---

[2] Many of the 13,000 active and former employees who participate in the Retirement Plan are also participants in the Savings Plan.
[3] 11 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

in the Plans, holding $477 million as of December 31, 2015, out of total aggregate assets of $2.5 billion subject to participant direction. The Stock Account has been included in the Plans since at least 2009. In its Prospectus, the CREF Stock Account states that it "invests at least 80% of its assets in a broadly diversified portfolio of common stocks." In the fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account in the "Large Blend" Morningstar category. This fund option has for years historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

53.     The Plans' fiduciaries continued to retain the CREF Stock Account as an investment offering without undertaking a prudent process to determine whether it was a prudent alternative and in the exclusive best interest of the Plans' participants and beneficiaries, or ignoring the results of their periodic monitoring. Moreover, as noted previously, until 2015, the CREF Stock Account paid 56.5 bps for administrative expense in the form of revenue sharing. That amount fell to 20 basis points with the introduction of the three different share classes.

54.     Prudent fiduciaries of large defined contribution plans who consider including actively managed funds among plan investment options must conduct an analysis to determine whether such funds, particularly large cap funds, will outperform their benchmarks, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

55.     Defendant failed to undertake such analysis when it selected the CREF Stock Account and thereafter failed to adequately to monitor the fund and persistently ignored the readily available data of the fund's underperformance.

56.     Had Defendant conducted such an analysis, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index net of fees that are more than ten times the fees of better performing index funds. The historical performance of the Stock Account has borne out those expectations.

57.     Rather than performing poorly in a single year or two, the CREF Stock Account has persistently performed worse, over a period of many years, than available lower-cost index funds and the index benchmark. In participant communications, Defendant and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014.[4] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Plus) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap, blend investments.

---

[4] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500 with the Department of Labor.



58.     The CREF Stock Account, with an expense ratio of 70 bps during most of the relevant period, and dropping to 32 basis points in 2015, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

59.     Apart from underperforming passively managed index funds, the CREF Stock Account also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



60.     The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2014.[5]

---

[5] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.







61.     Despite the consistent underperformance, the CREF Stock Account (Class R3), with an expense ratio of 38 bps as of May 1, 2016, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), and the Vanguard PRIMECAP (Adm) (33 bps).

62.     Reflecting the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[6] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio

---

[6]     Available     at:     http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

63.     The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plans and the opinion of one of the foremost authorities in the retirement investment industry that ***no*** retirement plan should own this fund.

64.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

65.     Had the Defendant removed the CREF Stock Account from the Plans' investment options and had the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth in ¶¶61, 62 and 63, the Plans' participants would not have lost millions of dollars' worth of their retirement savings.

### C.     TIAA Real Estate Account

66.     Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues on a consistent basis to underperform comparable

real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

67.     With an expense ratio of 88.5 bps as of May 1, 2016, the TIAA Real Estate Account also charges excessive and unreasonable fees. It is over 10 times more expensive than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.



68.     The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index Fund over the one-, five-, and ten-year periods ending December 31, 2009.[7] Despite this, Defendant selected and continues to retain it as an investment option in the Plans.

---

[7] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.



69.     This underperformance for years since 2009 has continued. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2015.



70.     The very design of the TIAA Real Estate Account creates such operational difficulties and burdens the fund with such significant additional expense that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans, like the Plans.

71.     The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

72. Additionally, the fund invests directly in real property assets that are highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but charges participants an additional 17 basis points for that liquidity guarantee.

73. The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points. A reasonable fiduciary would have questioned why the recordkeeping for a participant invested in the Real Estate Account should cost double what it costs for recordkeeping a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

74. Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees." Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; a fee that gets paid to TIAA. The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

75. The Real Estate Account's poor performance coupled with 42 basis points in excessive fees makes the TIA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendant's fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits

under the Plans.

76.     As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, the Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as an investment option for the Plans, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

77.     Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, the Plans' participants would not have lost millions of dollars' worth of their retirement savings.

###     D.     There are demonstrable flaws in Defendant's fiduciary and administrative process

78.     A reasonable fact-finder could easily infer from the extraordinary amount assessed against the Plans for recordkeeping expense and distribution fees, the availability of Institutional class shares for all of the included Vanguard funds, and the abysmal performance of the CREF Stock Account and TIAA Real Estate Account together with the Real Estate Account's exorbitant and unnecessary fees, that something must be wrong with the process by which the Defendant protects the interests of its faculty and employees.  But there is substantial other evidence of administrative failure that corroborates that inference.

###     1.     Illegal Loan Arrangement

79.     The participant loan program administered by TIAA operates in clear violation of the prohibited transaction rules and the conditions for the regulatory exemption from those prohibited transaction rules regarding plan loans.

80.     Ordinarily, when a plan participant borrows from a plan account, the participant is

deemed to have invested the account in the loan. The loan proceeds are derived from liquidating the participant's investment, and the loan effectively becomes a "fund" in which the participant has invested. As an example, suppose that a participant has a current plan account balance of $60,000, allocated equally among three different mutual funds, Fund A, Fund B, and Fund C, and the participant elects to borrow $6,000 from the plan account. The plan trustee will liquidate $2,000 from each of the three investment funds and will distribute the $6,000 to the participant in exchange for a note signed by the participant, obligating the participant to repay the loan at a stated rate of interest.

81.     The usual retirement plan loan process is exemplified by the description in the Charles Schwab standardized loan policy for 401(k) plans:

> ***Each loan shall be an earmarked investment of the Participant's account***. Subject to any restrictions on withdrawals from a particular investment fund, loan proceeds will be taken pro rata from the investment fund or funds in which the Participant's account balance is invested. However, loan proceeds will ***not*** be taken from any portion of a Participant's account that is invested in an employer stock investment fund. If a Participant has a Personal Choice Retirement Account®, such Participant will be contacted if funds in this account need to be liquidated to provide loan proceeds. As a loan is repaid, a Participant's payments will be allocated to the investments he or she has selected under the Plan (or, where appropriate, investments that are considered the Plan's default investment fund(s)) on a pro-rata basis, based on the investment election in effect on the date a payment is deposited to the Plan. (Emphasis added.)

82.     Participant loans are governed by 29 CFR § 2550.408b-1, which requires, among other conditions, that a loan must bear a reasonable rate of interest. As provided in 29 CFR § 2550.408b-1(e), "[a] loan will be considered to bear a reasonable rate of interest if such loan provides ***the plan*** with a return commensurate with the interest rates charged by persons in the business of lending money for loans which would be made under similar circumstances." (Emphasis added.)

83.     Suppose at the time of the participant's loan, the commercial rate for such loans is 6%. As a result of the loan transaction described in paragraph 83, the participant's account will

have $18,000 invested in each of Fund A, Fund B, and Fund C, and will have $6,000 invested in a loan paying 6% interest. All of the installment loan repayments will be credited to the participant's account, and the participant will earn the rate of interest charged on the loan.

Defendant's Retirement Plan Loans

84.     Loans made through TIAA do not follow this loan process. Instead, TIAA's loan process requires a participant to borrow from TIAA's general account rather than from the participant's own account. In order to obtain the proceeds to make such a loan, TIAA requires each participant to transfer 110% of the amount of the loan from the participant's plan account— in our example, Fund A, Fund B, and Fund C—to TIAA's "Traditional Annuity,"[8] as collateral securing repayment of the loan. The Traditional Annuity is a general account product that pays a fixed rate of interest, currently guaranteed to be 3%.

85.     The Traditional Annuity is a general account product, which means that all of the assets are held in TIAA's general account and are owned by TIAA. Therefore, TIAA also owns all the assets transferred to its general account to "collateralize" the participant loan.

86.     Because the participant loan is made from TIAA's general account, the participant is obligated to repay the loan to TIAA's general account, and the general account earns all of the interest paid on the loan, in contrast to the loan programs for virtually every other retirement plan in the country (and including loans to Plan participants who have invested through Vanguard), where the loan is made from and repaid to the participant's account and the participant earns all of the interest paid on the loan.

87.     Any reasonable plan fiduciary who had performed a diligent and prudent review of this loan process should have been able to recognize the self-dealing inherent in the loan

---

[8] Effective in July 2016, loan "collateral" was invested in a TIAA Retirement Loan certificate.

process and the inconsistencies with DOL regulations governing plan loans.

88.     These failures are not insignificant nor without consequence. The singular focus of the regulatory efforts of the Employee Benefits Security Administration of the DOL for the past ten years or more has been the enhancement of reporting of plan financial information because of its critical importance to participants, who bear the burden of investment decisions, in effectively planning for their retirement. Even worse than ignorance on the part of participants, however, is the prospect of ignorance on the part of Plan fiduciaries who are charged with protecting the interests of those participants.  The complete and utter failure to report TIAA's indirect compensation suggest that Defendant does not know what that compensation is.

89.     Likewise, the approval of a loan process that is in clear violation of ERISA rules and that is designed to generate exorbitant profits for TIAA at the expense of Plan participants provides demonstrable proof of Defendant's flawed fiduciary decision-making process. Defendant's failure to comprehend and act on the compensation scheme created by TIAA for its participant loan program simply cannot be explained.

### 2.     Reporting Failures

90.     In a 2012 TIAA-CREF publication entitled "Plan Sponsor Service and Fee Disclosure Guide," (the "Fee Disclosure Guide") TIAA-CREF explained to its plan sponsor customers that recent changes to the annual reporting obligations for employee benefit plans on Schedule C of Form 5500 required enhanced reporting to the help fiduciaries review plan fees and expenses as a part of their ongoing obligation to monitor their service provider arrangements."

91.     The Fee Disclosure Guide further states: "If plan loans are offered, the collateral remains in the participant's account and continues to earn income that that is credited to the

account.  The income earned on the collateral held for a loan offsets a portion of the loan interest paid by the participant.  The net difference between the amount paid by a participant for a plan loan and the amount received by the participant on collateral held for his or her plan loan is considered indirect compensation paid to TIAA."  Of course, even that description is not entirely accurate, because the collateral for the loan, by TIAA loan rules, must be taken out of the participant's selected investment choice and deposited into TIAA's general account.  So the real amount that TIAA is receiving as indirect compensation is the difference between the amount paid by TIAA on the collateral and the amount earned on TIAA's general account investments, a component of which is the interest paid on the participant's loan.

92.     Not a single annual report filed with the DOL on Form 5500 for either Plan includes any disclosures of the indirect compensation being received by TIAA as Plan recordkeeper other than to disclose that it has received indirect compensation.   It is the responsibility of the Defendant as Plan Administrator to ensure that the Annual Return is complete and accurate, and to report to the DOL any service provider who fails or refuses to provide compensation information required to be include on the Form 5500. Yet we know with certainty that TIAA is receiving indirect compensation in connection with plan loans—compensation that TIAA has expressly identified in the Fee Disclosure Guide as being reportable indirect compensation.

## VI.     ERISA'S FIDUCIARY STANDARDS

93.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)     for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

94.     Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

95.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

96.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the

breach.

97.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VII.   CLASS ACTION ALLEGATIONS

98.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

99.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of The University of Chicago Contributory Retirement Plan and The University of Chicago Retirement Income Plan for Employees from May 18, 2011, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan.

100.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes thousands of members and are so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the

Defendant owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendant's breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plans were harmed by Defendant's misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interests that are in conflict with the Class, are committed to the vigorous representation of the Class and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede

those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

101.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

102.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### Breach of Duties of Loyalty and Prudence—Excessive and Unreasonable Administrative Fees and Expenses

103.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

104.    The scope of the fiduciary duties and responsibilities of the Defendant includes and administering the Plans and managing their assets for the sole and exclusive benefit of the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendant is directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent

ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

105.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

106.     Defendant selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

107.     For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

108.     Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

109.     Defendant's failure to properly evaluate the reasonableness of amounts being charged to the Plans have caused the Plaintiffs and the Class millions of dollars in direct economic loss.  The Plans' total losses will be determined after complete discovery in this case and are continuing.

110.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count

and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duties of Loyalty and Prudence—Failure to Prudently Monitor Plan Investment Choices

111.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

112.    Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator of the Plans under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

113.    Prudent fiduciary practice and investment policy would include (i) quarterly performance evaluation of each of the Plan's investment choices in including comparisons to a benchmark and to a peer group of alternative investments, (ii) putting funds that fell below acceptable standards for a period of consecutive quarters on a watch list, and replacement of a fund after persistent under-performance.  The performance of the CREF Stock Account falls completely outside the guidelines of any reasonable investment policy.  The failure to take any affirmative action in light of historic performance and excessive expense could only have occurred in the absence of a prudent process.  And if Defendant had engaged in a prudent process, the failure to act in accordance with the obvious conclusion of that process, would be

the definition of a breach of the duties of prudence and diligence.

114.    Defendant's failure to adequately evaluate the performance of the CREF Stock Account or its associated fees and expenses, has caused the Plaintiffs and the Class millions of dollars in lost earnings.

115.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Breach of Duties of Loyalty and Prudence—Failure to Prudently Monitor Plan Investment Choices

116.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

117.    Prudent fiduciary practice and investment policy would include (i) quarterly performance evaluation of each of the Plan's investment choices in including comparisons to a benchmark and to a peer group of alternative investments, (ii) putting funds that fell below acceptable standards for a period of consecutive quarters on a watch list, and replacement of a fund after persistent under-performance.  The performance of the TIAA Real Estate Account falls completely outside the guidelines of any reasonable investment policy.  Moreover, numerous other investment funds are readily available in the marketplace that do not bear the excessive, unnecessary and unreasonable fees and expenses for an independent fiduciary or the expense of ensuring liquidity to pay benefits.  The availability of other investment choices for the real estate asset class also suggests that these additional expenses should have been borne by TIAA and not the pan investors, since these expenses are being incurred solely to allow TIAA to offer this fund as an investment choice in participant-directed individual account plans.  The

failure to understand these additional fees and expenses or to take any affirmative action in light of historic under-performance and excessive expense could only have occurred in the absence of a prudent process. And if Defendant had engaged in a prudent process, the failure to act in accordance with the obvious conclusion of that process, would be the definition of a breach of the duties of prudence and diligence.

118.    Defendant's failure to adequately evaluate the performance of the TIAA Real Estate Account or its associated fees and expenses, has caused the Plaintiffs and the Class millions of dollars in lost earnings.

119.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### Prohibited Transaction – Lending of Money or Other Extension of Credit Between a Plan and a Party in Interest

120.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

121.    ERISA § 406(a)(1)(B), 29 U.S.C. §1106(a)(1)(B), provides that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

122.    Defendant is a fiduciary responsible for arranging for and administering the participant loan program with respect to the Plans.

123.    Defendant is a fiduciary responsible for determining the interest rate for participant loans, for transferring assets from the accounts of participants who take loans from

their retirement accounts to the Defendant's Traditional Annuity or to a Retirement Loan certificate, and for determining the interest rate participants will receive on their loan "collateral" invested in the Traditional Annuity or in Retirement Loan certificate.

124. By accepting and approving the design and administration of a loan program in a manner intended to benefit TIAA, a party in interest to the Plans, at the expense of Plaintiff and Class members, violated its duty of loyalty set forth in ERISA § 404(a).

125. By accepting and approving the design and administration of a loan program that violated the conditions for the exemption available for plan loans set forth in 29 CFR 2550.408b-1, Defendant has caused the Plans to engage in prohibited transactions in violation of ERISA § 406(a).

126. Defendant is liable under 29 U.S.C. §1109(a) to make good to Plaintiff and the Class losses resulting from the prohibited transactions alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT V

### Prohibited Transaction – Transfer of Plan Assets to or for the Use of a Party in Interest

127. Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

128. ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), prohibits a plan fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

129. ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) provides that a "party in interest" includes "a person providing services to [a] plan."

130.    TIAA is a party in interest with respect to Plaintiffs, the Plans, and the Class, providing record keeping, custodial, and other investment and administrative services to the Plans.

131.    The requirement that participants in the Plans must transfer a portion of a their accounts to TIAA as security for repayment of a plan loan constitutes a prohibited transfer of plan assets to or for the use and benefit of TIAA, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

132.    By requiring that the Plaintiffs and Class members transfer a portion of a their retirement savings to TIAA as security for repayment of a participant loan, as a result of which TIAA will earn the spread between the interest charged to the participant for the loan and the interest paid by TIAA to the plan participant through the Traditional Annuity or the Retirement Loan certificate, Defendant is causing the Plans to transfer plan assets to or for the use and benefit of a party in interest in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

133.    Defendant is liable under 29 U.S.C. §1109(a) for all losses to Plaintiffs and Class members resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

• Find and declare that the Defendant has breached its fiduciary duties as described above;

• Find and adjudge that Defendant is personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

• Determine the method by which the Plans' losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plans under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendant and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plans to include only prudent investments;

• Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schneider Wallace Cottrell Konecky Wotkyns LLP, Wexler Wallace LLP and Berger & Montague P.C. as Class Counsel;

• Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.


Dated: May 18, 2017                    By:     */s/ Mark R. Miller*
                                               Kenneth A. Wexler
                                               Mark R. Miller
                                               WEXLER WALLACE LLP
                                               55 West Monroe Street, Suite 3300
                                               Chicago, Illinois 60603
                                               Telephone: (312) 346-2222
                                               Facsimile: (312) 346-0022
                                               kaw@wexlerwallace.com
                                               mrm@wexlerwallace.com

Michael McKay*
John J. Nestico*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com
jnestico@schneiderwallace.com

Todd Schneider*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

Todd S. Collins*
Eric Lechtzin
Ellen T. Noteware*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiff*

**Pro Hac Vice* application forthcoming