**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| WINIFRED J. DAUGHERTY et al., | ) | Case No. 1:17-cv-03736 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | Hon. Judge Ruben Castillo |
| v. | ) |  |
|  | ) |  |
| THE UNIVERSITY OF CHICAGO, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS AND TO STRIKE JURY DEMAND**

## TABLE OF CONTENTS

BACKGROUND ...........................................................................................................................2

    I.    403(b) Retirement Plans ...............................................................................................2

    II.    The University of Chicago Retirement Plans .......................................................3

    III.    The Plans' Investment Options..................................................................................4

        A.    The CREF Stock Account ...............................................................................6

        B.    The TIAA Real Estate Account ......................................................................7

    IV.    The Participant Loan Program ....................................................................................8

ARGUMENT ...............................................................................................................................9

    I.    PLAINTIFFS DO NOT HAVE STANDING FOR CERTAIN
        CLAIMS. .......................................................................................................................9

    II.    PLAINTIFFS HAVE NOT STATED A CLAIM UNDER ERISA......................11

        A.    Plaintiffs Have Not Plausibly Alleged that the University
            Breached the Duty of Prudence (Counts I, II, and III)............................12

            1.    Excessive Administrative Fees Claim (Count I)............................13

            2.    Failure to Monitor Investment Choices
                (Counts II and III). ..........................................................................15

        B.    Plaintiffs Have Not Plausibly Alleged that the University
            Breached its Duty of Loyalty (Counts I, II, and III) .................................20

        C.    Plaintiffs Have Not Plausibly Alleged that the University
            Caused the Plans to Engage in Prohibited Transactions
            (Counts IV and V)...................................................................................21

            1.    Count IV....................................................................................21

            2.    Count V ......................................................................................24

    III.    THE COURT SHOULD STRIKE PLAINTIFFS' JURY DEMAND..................25

CONCLUSION............................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................11, 12

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009)...................................................................................15

*Cabin v. Plastofilm Indus., Inc.*,
  No. 96-CV-2564, 1996 WL 496604 (N.D. Ill. Aug. 29, 1996) (Castillo, J.)..........................25

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
  Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005)................................................................................10

*In re Citigroup ERISA Litig.*,
  104 F. Supp. 3d 599 (S.D.N.Y. 2015)...................................................................10

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)............................................................................................11

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ..............................................................................10

*DeBruyne v. Equitable Life Assurance Soc. Of the U.S.*,
  920 F.2d 457 (7th Cir. 1990) .....................................................................13, 15, 16

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ..............................................................................15

*Donovan v. Beirwirth*,
  680 F.2d 263 (2d Cir. 1982)................................................................................20

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) ............................................................................15

*Fifth Third Bancorp. v. Dudenhoeffer*,
  134 S.Ct. 2459 (2014).........................................................................................12

*George v. Kraft Foods Glob., Inc.*,
  Nos. 07 C 1713, 07 C 1954, 2008 WL 780629 (N.D. Ill. Mar. 20, 2008)..............................25

*Harley v. Minn. Mining & Mfg. Co.*,
    284 F.3d 901 (8th Cir. 2002) ...................................................10

*Heath v. Varity Corp.*,
    71 F.3d 256 (7th Cir. 1995) ....................................................20

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ...................................................3

*Howard v. Shay*,
    100 F.3d 1484 (9th Cir. 1996) ...............................................15

*Johnson v. U.S. Office of Pers. Mgmt.*,
    783 F.3d 655 (7th Cir. 2015) .................................................11

*Lee v. Verizon Commc'ns, Inc.*,
    837 F.3d 523 (5th Cir. 2016) .................................................10

*Limestone Dev. Corp. v. Vill. Of Lemont, Ill*,
    520 F.3d 797 (7th Cir. 2008) .................................................11

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) .............................................14, 20

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) .................................................10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................9

*Matthews v. Sears Pension Plan*,
    144 F.3d 461 (7th Cir. 1998) .................................................25

*In re McKesson HBOC, Inc. ERISA Litig.*,
    391 F. Supp. 2d 812 (N.D. Cal. 2005) ....................................20

*Patton v. MFS/SON Life Fin. Distributions, Inc.*,
    480 F.3d 478 (7th Cir. 2007) .................................................25

*Perelman v. Perelman*,
    793 F.3d 368 (3d Cir. 2015)..................................................10

*Plummet v. Fluid Pump Serv., Inc.*,
    124 F.3d 849 (7th Cir. 1997) .................................................25

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)..................................................14

*Romero v. Nokia*,
  No. C 12-6260 PJH, 2013 WL 56923234 (N.D. Cal. Oct. 15, 2013) ...................................20

*Silha v. ACT, Inc.*,
  807 F.3d 169 (7th Cir. 2015) .....................................................................................9

*Spano v. Boeing Co.*,
  No. 06-CV-743-DRH, 2007 WL 1149192 (S.D. Ill. Apr. 18, 2007).....................................25

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*,
  712 F.3d 705 (2d Cir. 2013)...........................................................................12, 15, 16

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ...........................................................................12, 14

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996)..................................................................................12, 15

*Wardell v. Cent. States, Se. & Sw. Area Pensions Fund*,
  627 F.2d 820 (7th Cir. 1980) ...................................................................................25

*White v. Chevron Corp.*,
  Case No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017)...........................13

*White v. Chevron Corp.*,
  No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal Aug. 29, 2016) ...................14, 16, 20, 21

**Statutes**

29 U.S.C. § 1104(a)(1)(B) ..............................................................................................12, 17

29 U.S.C. § 1106(a)(1)(B) .....................................................................................................21

29 U.S.C. § 1106(a)(1)(D)......................................................................................................24

29 U.S.C. § 1108(b)(1) ...........................................................................................................22

29 U.S.C. § 1108(b)(1)(A)–(C).............................................................................................22

29 U.S.C. § 1108(b)(1)(D).....................................................................................................22

29 U.S.C. § 1108(b)(1)(E)......................................................................................................24

29 U.S.C. § 1108(b)(17) .........................................................................................................23

**Other Authorities**

29 C.F.R. § 2550.408b-1......................................................................................22

29 C.F.R. § 2550.408b-1(e)................................................................................22

29 C.F.R. § 2550.408b-1(f)(1)............................................................................24

U.S. Const. amend. VII.......................................................................................25

This is one of more than a dozen lawsuits that have been filed around the country against private universities arising from the operation of 403(b) retirement plans. While many of these cases assert similar legal claims, the alleged facts relating to each university are different, and therefore the merits of the claims depend on those very different facts. The alleged facts here make clear that there is no viable claim, and therefore the Complaint should be dismissed.

The claims here arise from the administration of two 403(b) retirement plans offered to employees of the University of Chicago (the "University"). The Complaint asserts three main claims: (1) the two plans paid excessive fees for administrative and recordkeeping services (Count I); (2) two of the roughly 100 investment options were imprudent and should have been removed from the plans (Counts II and III); and (3) that the plans' participant loan program was improper and violates ERISA's prohibited-transaction rules (Counts IV and V). None of these counts states a claim.

But before even determining whether these counts state a claim for relief, some of the claims should be dismissed for lack of standing. First, Plaintiffs purport to sue on behalf of two very different plans: the Contributory Retirement Plan ("CRP") and the Retirement Income Plan for Employees ("ERIP"). But the two remaining Plaintiffs, Winifred Daugherty and Gloria Jackson ("Plaintiffs"), were only participants in ERIP, not CRP, and therefore they have no standing to assert any claims relating to the CRP, and so claims relating to that plan should be dismissed. Second, Plaintiffs purport to bring claims relating to the participant loan program, but neither Plaintiff alleges she ever took out a loan, and thus Plaintiffs lack standing as to Counts IV and V.

As to the merits, Count I should be dismissed because Plaintiffs have not alleged any facts suggesting that ERIP paid excessive recordkeeping fees. Plaintiffs' sole allegation is that ERIP paid a higher fee than an unspecified benchmark (which they claim is $35 per participant), but

1

offer no allegations that this benchmark was applicable to 403(b) plans. Moreover, their claim is based on a notion that courts have rejected—that flat per-participant fees are the only appropriate means to pay and measure administrative fees.

Counts II and III should be dismissed because they make no allegations suggesting, as they must, that the University's process for evaluating investment options was deficient. Moreover, they entirely ignore the actual investment performance of the two options at issue, which does not plausibly show any chronic underperformance.

Counts IV and V should be dismissed because the scant allegations relating to the loan program—in which neither Plaintiff claims to have participated—do not amount to any violation of ERISA. Plaintiffs' argument seems to be that the loan program was non-standard, but that does not mean that it was non-compliant with ERISA. There is an exemption from the prohibited-transaction rules for loan programs, and Plaintiffs do not allege that any of the conditions of the exemption were violated.

Thus, the Complaint should be dismissed with prejudice.

## BACKGROUND

### I.      403(b) Retirement Plans

A 403(b) retirement plan, also called a tax-sheltered annuity or TSA plan, is the primary retirement vehicle for public schools and non-profit organizations. Ex. A, at 1–2 - IRS, *Retirement Plans FAQs regarding 403(b) Tax-Sheltered Annuity Plans*. Until 2007 when the regulatory landscape changed, insurance companies administered the annuity contracts offered to individual employees through such plans, with little or no employer involvement. *Id*. Employer involvement was minimized because the goal was to allow employees to participate in tax-deferred plans without imposing undue costs on not-for-profit entities. *Id*. And up to 2009, such plans were

exempt from ERISA's reporting requirements. Ex. B, at 9 - Advisory Council on Employee Welfare and Pension Benefit Plans, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011). As its name suggests, the primary investment options offered in 403(b) plans are insurer-issued annuities. *Id*. In fact, annuities were the only investment option for 403(b) plan participants until 1974, when Congress amended 26 U.S.C. § 403(b) to allow employees to invest in mutual funds. *Id*.

## II.    The University of Chicago Retirement Plans

One of the employment benefits offered at the University of Chicago is the ability to participate in a 403(b) retirement plan. CRP is open to full-time faculty, academic employees and University officers as well as certain other groups of University employees as detailed in the CRP plan document (*e.g.*, staff employees hired into highly compensated positions), while ERIP is the option most staff employees of the University become eligible for if they are 21 or more years of age and have completed one year of service, as detailed in the ERIP plan document. Ex. C, at 9 - *CRP Summary Plan Description 2016*;[1] Ex. D, at 10 – *ERIP Summary Plan Description 2016* (quoted in Compl. ¶ 23); *accord* Compl. ¶¶ 13, 17. Participants in CRP make contributions equal to 5% of their compensation to the plan, and the University makes a contribution for the employee's benefit equal to 8% of that employee's salary. Ex. C, at 7. For ERIP, a total of 13% of an employee's pay may be contributed to the plan, consisting of 5% deferred from the employee's paycheck, and an 8% matching contribution from the University. Ex. D, at 7.

---

[1] Consistent with Rule 12(b)(6), this Court can consider any documents cited or quoted in the Complaint, along with Summary Plan Descriptions, Trust Agreements, and publicly available fund prospectuses. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).

In both plans, employees fully control their retirement accounts. Each employee can choose between two investment companies, Teachers Insurance and Annuity Association-College Retirement Equities Fund ("TIAA") and The Vanguard Group ("Vanguard"), to manage their assets, or the employee can split their assets between the two providers. Ex. C, at 15; Ex. D, at 15.[2] Employees also decide "the investment funds in which [they] want [their] contributions and the University's contributions invested." Ex. C, at 15; Ex. D, at 15. In most circumstances, participants can change their investment choices at any time free of charge. Ex. C, at 16; Ex. D, at 16. And, to facilitate employees' choices, every year the University gives participants: "a current list of [the plans'] investment funds"; "[a]n explanation of any fees and expenses for general plan administrative services" or "based on services provided solely for [participants'] benefit, *e.g.*, service fees, if any, for taking a Participant Loan"; "information about historical investment performance, including 1-, 5-, and 10-year returns of investment funds"; "[t]he name and returns of appropriate broad-based securities market index over 1-, 5-, and 10-year periods so [participants] can benchmark the investment funds"; and the total annual operating expenses. *Id.* at 12–13.

## III.    The Plans' Investment Options

Participants can select investment options from two companies, TIAA and Vanguard, depending on how they choose to allocate their contributions. Compl. ¶ 28. TIAA is a stock life insurance company that has operated as a non-profit for almost 100 years. Ex. E, at 1 - TIAA, *Facts and Stats* (March 2017). Vanguard similarly operates "at-cost," meaning it charges

---

[2] *See also* Compl. ¶ 28 ("Participants in the Plans may allocate their contributions to TIAA-CREF, Vanguard, or both.").

participants only enough to cover its operational costs. Ex. F, at 1 - Vanguard, *Why Ownership Matters*.

The plans offer more than 100 different investment options. Compl. ¶ 7. Of those investment options, Plaintiffs only allege that two of them were problematic: the CREF Stock Account and the TIAA Real Estate Account. *Id*. ¶¶ 113–14, 117–18. Both options are variable annuity investment accounts, which differ from mutual funds in important ways. A mutual fund is an "open-end investment company that pools money from many investors and invests the money in stock, bonds, short-term money-market instruments . . . or some combination of these investments." Ex. G, at 2 - SEC, *Mutual Funds and Exchange-Traded Funds (ETFs) – A Guide for Investors*. Investments are made by purchasing shares, which represent the investor's proportionate share of the mutual fund's portfolio. *Id*. Mutual funds generally are popular investments because their investment advisors must be registered with the SEC, the funds generally have low minimum investment requirements, making them accessible to even small retail investors, and the funds are highly liquid. *Id*.

A variable annuity investment account is quite different. A variable annuity investment account is based on a contract that an investor has with an insurance company, under which the insurer agrees to make periodic payments to the investor starting either now or in the future. Ex. H, at 1 - SEC, *Variable Annuities: What You Should Know*. The right to receive periodic payments is key, since, depending on the particular product, it can provide a guaranteed stream of income and protect against the possibility that an investor will outlive their retirement assets. *Id*. Second, under a variable annuity contract, an investor can receive a death benefit, under which the contract provider will pay a specified amount to a surviving family member. *Id*. To cover the cost of providing these additional benefits, the annuity provider charges additional fees, like a mortality

5

and expense risk fee which compensates the insurance company for the risk of providing periodic payments indefinitely. *Id*.[3] In the early years, when participants are not receiving periodic payments, they can invest their premiums in variable annuity investment accounts that then invest in equities, mutual funds, and other securities. *Id*. The value of their annuity therefore fluctuates with the value of the securities.

### A. The CREF Stock Account

The CREF Stock Account is a variable annuity investment option in the University's retirement plans. Its objective is to obtain favorable returns by investing in a diversified portfolio of foreign and domestic common stocks. Ex. I, at 26 - *CREF Stock Account Prospectus* (May 1, 2017) (quoted in Compl. ¶ 52). Generally, about 65%–75% of the account's holdings are domestic stock, while about 25%–35% are foreign equities. *Id*. The CREF Stock Account's prospectus identifies its benchmark as "a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex USA Investable Market Index" with each index weighted according to the percentage of foreign and domestic equities in the account at any given time. *Id*. Measured against this benchmark, the CREF Stock Account has performed satisfactorily and appreciated almost 10% annually since its inception, as shown in the following chart:

| Performance | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Total Return** | | **Average Annual Total Return** | | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years | Since Inception |
| CREF Stock Account | 6.66% | 6.66% | 16.03% | 6.45% | 10.05% | 5.40% | 9.79% |
| CREF Composite Benchmark | 6.42% | 6.42% | 16.62% | 7.07% | 10.63% | 5.71% | – |

---

[3] *See also* Compl. ¶ 33 (alleging that the CREF variable annuity accounts charge fees for administration, distribution, mortality and expense risk, and investment management fees); *id.* ¶ 37 (alleging that the TIAA Real Estate Account charges the same fees, as well as fees for a liquidity guarantee).

Ex. J, at 1 - *CREF Stock Account Fact Sheet* (cited in Compl. ¶ 52).[4] The CREF Stock Account, as a variable annuity investment option, charges fees for investment management services, administrative expenses, distribution, and mortality and risk charges. Compl. ¶ 37. According to the Complaint, the expense ratio—*i.e.*, the sum of expense charges—was 0.70%, but in 2015 dropped to 0.32%. *Id.* ¶ 58.

### B.    The TIAA Real Estate Account

The second variable annuity investment option challenged in the Complaint is the TIAA Real Estate Account. The account's objective is to achieve long-term returns through appreciation of real estate and real-estate related investments, and rental income. Ex. K, at 3 – *TIAA Real Estate Prospectus* (cited in Compl. ¶¶ 46, 49). Unlike other real-estate related investments, the TIAA Real Estate Account invests between 65% and 80% of its assets in direct ownership interests in real estate. *Id.* at 4. Although its prospectus does not identify a benchmark, the TIAA Real Estate Account has also appreciated significantly over the last 10 years, as shown in the following chart:

| Performance | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Return | | Average Annual Total Return | | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years | Since Inception |
| TIAA Real Estate Account | 1.13% | 1.13% | 4.42% | 8.06% | 8.58% | 3.09% | 6.42% |

Ex. L, at 1 - *TIAA Real Estate Fact Sheet*.[5] Like the CREF Stock Account, the TIAA Real Estate

---

[4] Plaintiffs evaluate the performance of both variable annuity accounts "as of December 31, 2014." Compl. ¶¶ 57 n.4, 59, 60, and 69 (Paragraph 69 appears to mis-state the end-date as December 31, 2015). This artificial time restriction ignores CREF Stock Account's 16.03% increase over the last year. Ex. J, at 1.

[5] Although the TIAA Real Estate fact sheet is not cited in the Complaint, Defendant refers to it here because it includes the most up-to-date data. The TIAA Real Estate Prospectus, which is included as Ex. K to this memorandum and cited in the Complaint in paragraphs 46 and 49, shows substantially the same performance:

| AVERAGE ANNUAL TOTAL RETURNS (AS OF DECEMBER 31, 2016) | | | | |
|---|---|---|---|---|
| | 1 Year | 3 Year | 5 Year | 10 Year |
| TIAA Real Estate Account | 5.20% | 8.49% | 9.03% | 3.38% |

Ex. K, at 11.

7

Account charges fees for investment management services, administrative expenses, distribution, and mortality and risk. Compl. ¶ 37. It also charges a fee for a liquidity guarantee, which ensures that participant can redeem their investment in the account even when the Account lacks sufficient liquidity. Ex. K, at 12. The expense ratio as of May 1, 2016 was approximately 0.87% or 0.885%. Compl. ¶ 67.[6]

## IV.    The Participant Loan Program

Through TIAA, plan participants have the option of borrowing against the assets in their retirement accounts. Compl. ¶ 79. Under the loan program, participants transfer 110% of the loan amount from the investment options in their plan account to the TIAA Traditional Annuity, which is another of the plans' investment options. *Id.* ¶ 84. The TIAA Traditional Annuity pays a guaranteed 3% fixed interest rate. *Id.* While the security appreciates in value, the loan recipient repays the loan with interest. *Id.* ¶ 91. (The interest rate TIAA charges is not alleged in the Complaint.) As the loan is paid off, monies are transferred back from the TIAA Traditional Annuity to the participant's account where it gets reinvested according to the participant's preferences. Assuming the loan is timely repaid, all the collateral that secured the loan—*i.e.*, 110% of the loan amount—will be credited to the participants account, as will the 3% interest earned on those assets. *See* Compl. ¶ 91. As compensation for administering the loan program, TIAA keeps

---

[6] The Complaint is not clear on this point. The text of Paragraph 67 says that the expense ratio was "88.5 bps," whereas the chart immediately below that paragraph shows that the expense was "87 bps." (One "bps," or basis point, equals 1/100 of one percent or 0.01%.)

the "difference between the amount paid by a participant for a plan loan and the amount received by the plan participant on collateral held for his or her loan." Compl. ¶ 91.

## ARGUMENT

The Complaint should be dismissed for two main reasons: (1) Plaintiffs do not have standing to pursue certain of the claims asserted, and (2) the Complaint fails to state a claim upon which relief can be granted. In addition, the Court should strike the jury demand because the Seventh Circuit has repeatedly held there is no right to a jury trial under ERISA.

## I.    PLAINTIFFS DO NOT HAVE STANDING FOR CERTAIN CLAIMS.

Plaintiffs do not have standing to bring two of the claims alleged in the Complaint, and therefore those claims should be dismissed before even reaching the validity of the asserted claims. First, Plaintiffs purport to bring claims on behalf of two different plans (ERIP and CRP), but Plaintiffs are only participants in ERIP, so they have no standing to assert claims on behalf of CRP participants. Second, in Counts IV and V, Plaintiffs assert claims relating to the plans' loan program, but neither Plaintiff alleges she took out loans at all, let alone one within the limitations period. Thus, each of these claims should be dismissed for lack of standing.

"[I]n evaluating whether a complaint adequately pleads the elements of standing, courts apply the same analysis used to review whether a complaint adequately states a claim." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).[7] The "irreducible constitutional minimum" of standing requires Plaintiffs to allege they have suffered an injury-in-fact, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), which is no less true in ERISA cases brought under 29

---

[7] S*ee also id.* at 174 ("Therefore, we join many of our sister circuits and hold that when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6).")

U.S.C. §§ 1132(a)(2) and (3). In fact, the Circuit Courts are unanimous in holding that an ERISA participant seeking to sue on behalf of a plan still must allege that they themselves have suffered an injury-in-fact to invoke the Court's subject matter-jurisdiction.[8]

Application of these standards makes clear that Plaintiffs do not have standing to assert claims relating to CRP. Although Steve Millard alleged he was a participant in CRP, he voluntarily dismissed his claims.[9] ECF No. 5. The two remaining Plaintiffs, Daugherty and Jackson, are participants in ERIP, not CRP. Compl. ¶¶ 19–20. Plaintiffs cannot sue the University for administering a plan in which they are not participants. *See, e.g., In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 612–13 (S.D.N.Y. 2015). Therefore, the Court should dismiss Plaintiffs' claims to the extent the claims relate to CRP.

For similar reasons, Plaintiffs have failed to allege an injury-in-fact resulting from the participant loan program. Simply put, Plaintiffs do not allege that they ever took loans from their ERIP accounts. Compl. ¶¶ 19–20. The allegations regarding the two Plaintiffs list the various investments each had, but there is no mention that either Plaintiff had any loans, let alone one during the limitations period. *Id*. Plaintiffs therefore do not allege that they suffered any harm from the loan program, and do not have standing to bring claims related to the loan program. *Cf.*

---

[8] *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 529 (5th Cir. 2016) ("bare allegation of incursion on the purported statutory right to 'proper plan management' under ERISA is insufficient to meet the injury-in-fact prong of Article III standing"), *cert. denied sub nom., Pundt v. Verizon Commc'ns, Inc.*, 137 S. Ct. 1374 (2017); *Perelman v. Perelman*, 793 F.3d 368, 375–76 (3d Cir. 2015) ("other federal appellate courts have unanimously rejected" the theory that an uninjured participant may sue for a fiduciary breach on behalf of an ERISA plan); *David v. Alphin*, 704 F.3d 327, 336–38 (4th Cir. 2013) (holding that individual plaintiffs must show a "direct injury" to their future benefits in order to have standing); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608–09 (6th Cir. 2007) ("Merely because Plaintiffs claim that they are suing on behalf of their respective ERISA plans does not change the fact that they must also establish individual standing."); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 200 (2d Cir. 2005) ("Obtaining restitution or disgorgement under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by 'demonstrat[ing] individual loss.'"); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002) (holding that it would transgress "the limits on judicial power imposed by Article III" to permit uninjured plan participants to sue in a representative capacity).

[9] In fact, Millard was never a participant in CRP according to the University's records.

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (holding that "a plaintiff must demonstrate standing for each claim he seeks to press" (citing *Allen v. Wright*, 468 U.S. 737, 752 (1984)); *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 662 (7th Cir. 2015) (same). For this reason alone, Counts IV and V should be dismissed for lack of standing.

## II.     PLAINTIFFS HAVE NOT STATED A CLAIM UNDER ERISA.

Even if Plaintiffs have standing for all of their claims, the Complaint should be dismissed in its entirety because the allegations are legally insufficient and implausible. In Counts I, II, and III, Plaintiffs contend that the University breached the duty of prudence by (1) allowing the plans to be charged excessive administrative fees and (2) failing to monitor the plans' investment options. Plaintiffs' also suggest that the same facts underlying these claims constitute a breach of the University's duty of loyalty. In Counts IV and V, Plaintiffs allege that the plans' participant loan program violates ERISA's prohibited-transaction rules. The allegations underlying all these claims, however, are insufficient to state a claim. The Court therefore should dismiss Plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Complaint must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007), meaning that from the facts alleged the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. The level of factual detail necessary depends on the complexity of the claims. *Limestone Dev. Corp. v. Vill. Of Lemont, Ill*, 520 F.3d 797, 803 (7th Cir. 2008). For complex litigation or cases in which discovery is likely to be unusually costly, as is the case here, "a fuller set of factual allegations may be necessary to

11

show that relief is plausible." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). Although the Court assumes the factual allegations in the Complaint are true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### A.   Plaintiffs Have Not Plausibly Alleged that the University Breached the Duty of Prudence (Counts I, II, and III).

Counts I, II, and III allege that the University breached its duty of prudence by allowing the plans to be charged excessive fees (Count I) and by failing to prudently monitor two of the roughly 100 investment options in the plans. Compl. ¶¶ 103–115. The allegations supporting those claims are insufficient under Rule 12(b)(6), and therefore these claims should be dismissed. As the Supreme Court recently held with respect to ERISA claims for breach of the duty of prudence, a motion to dismiss is "one important mechanism for weeding out meritless claims." *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S.Ct. 2459, 2471 (2014).

ERISA requires plan fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). This duty of prudence "'is measured according to the objective prudent person standard developed in the law of trusts.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting *La Scala v. Scrufari¸* 479 F.3d 213, 219 (2d Cir. 2007)). A fiduciary's actions are judged "based upon information available to the fiduciary at the time of each . . . decision and not from the vantage point of hindsight." *Id*. (quoting *In re Citigroup, ERISA Litig.,* 662 F.3d 128, 140 (2d Cir. 2011)). The focus of the inquiry is on the process used to make a decision, not on its results, and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *In re*

*Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). The Complaint, however, contains no allegations suggesting that the University's methods or decision-making process was flawed.

### 1. Excessive Administrative Fees Claim (Count I).

In Count I, Plaintiffs contend that the fees the plans were charged for recordkeeping and other administrative services were excessive. Compl. ¶ 49. Plaintiffs appear to be arguing that, as a matter of law, recordkeeping and administrative fees must be assessed as a flat, per-participant fee, rather than as a percentage of assets. Alternatively, Plaintiffs suggest that the fees charged to plan participants were unreasonable regardless of how they were assessed. Both claims fail.

Contrary to settled law, Plaintiffs' excessive-fee claims focus entirely on results, not the University's processes. Plaintiffs point to the fact that the plans allegedly paid "millions of dollars in excessive recordkeeping fees each year" as support for their claim that the University's process for monitoring and managing recordkeeping fees was flawed. *Id*. But the Seventh Circuit has held unequivocally that "the ultimate outcome of [a decision] is not proof of imprudence." *DeBruyne v. Equitable Life Assurance Soc. Of the U.S.*, 920 F.2d 457, 467 (7th Cir. 1990). To properly state a claim for a breach of the duty of prudence, Plaintiffs cannot simply allege that the plans may, in retrospect, have paid too much for recordkeeping; they must allege "facts showing [that the University] failed to conduct a prudent process" for evaluating and monitoring recordkeeping and administrative fees. *Cf. White v. Chevron Corp.*, Case No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017) *appeal docketed* No. 17-16208 (9th Cir.). The Complaint fails to allege facts suggesting that that process was flawed; the only allegations relating to the University's process with respect to the plans' administrative fees are entirely conclusory. Compl. ¶¶ 107–08. For this reason alone, Plaintiffs excessive-fee claims should be dismissed.

Plaintiffs' claims also rests on a premise which courts—including the Seventh Circuit—have consistently rejected: that fees assessed as a percentage of assets invested, rather than as a flat-fee, are *per se* excessive. As the Seventh Circuit explained, a "flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a capitation fee could work out to more, per dollar under management." *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). A flat-fee model, in other words, is a mixed bag for participants: "flat payments per participant may help some participants but hurt others, depending on the size of each participant's account." *Id*. at 672–673. Other courts agree that ERISA does not require plans to use a per-participant fee. *Renfro v. Unisys Corp.*, 671 F.3d 314, 326–28 (3d Cir. 2011); *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal Aug. 29, 2016). To the extent Plaintiffs' excessive-fee claims rest on the idea that ERISA requires a flat per-participant fee, it is identical to the one the Seventh Circuit considered—and rejected—in *Loomis*, and it must likewise be rejected.

Moreover, the entire basis for the claim that the plans incurred excessive administrative fees is based on a conclusory allegation about the "benchmark" costs for recordkeeping. The Complaint alleges that unspecified "benchmark data" indicates that the plans should only have paid $35 per participant but instead the "Plans" paid "at least hundreds of dollars per year." Compl. ¶ 48–49. The factual basis for these allegations is missing; Plaintiffs do not point to any benchmark data for 403(b) plans (nor in what years the claimed $35 amount was the so-called benchmark) and they do not explain how they computed that the plans must have paid "at least hundreds" of dollars per year in administrative fees. Nothing about these allegations suggests the claims are plausible, and Plaintiffs should not be allowed to impose the costs of discovery on a not-for-profit institution with such bald factual allegations. *See Tamayo*, 526 F.3d at 1083.

At bottom, Plaintiffs' excessive-fee claims have it backwards: to state a claim Plaintiffs must allege facts suggesting that a flaw in the University's decision-making process caused the plans to be charged unreasonable fees. The Complaint does the reverse, using the overall amount of fees charged to the plans as evidence that there was a flaw in the University's decision-making process. Courts have overwhelmingly rejected that approach.[10] The Court should therefore dismiss Plaintiffs' excessive-fee claims for failure to state a claim.

### 2. Failure to Monitor Investment Choices (Counts II and III).

The breach-of-fiduciary-duty claims alleged in Counts II and III of the Complaint fare no better. Those counts allege that the University breached its duty to prudently monitor the plans' investment options by failing to remove the CREF Stock Account (Count II) and TIAA Real Estate Account (Count III), which they allege were chronic underperformers. Like Plaintiffs' excessive-fees claims, their failure-to-monitor claims focuses entirely on results rather than process, and ignores the fact that each of these investment options dramatically appreciated over the relevant time period. Accordingly, the Court should dismiss Counts II and III.

Whether the University prudently monitored the CREF Stock Account and TIAA Real Estate Account as investment options depends on the process the University used in evaluating them. *In re Unisys Sav. Plan Litig.*, 74 F.3d at 434 (ERISA's duty of prudence "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."). "[T]he ultimate outcome of an investment is not proof of imprudence," and Plaintiffs cannot allege "that [the University] was imprudent merely because the [investment

---

[10] *See, e.g.*, *DeBruyne*, 920 F.2d at 467; *St. Vincent*, 712 F.3d at 716; *Unisys*, 74 F.3d at 434; *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7–8 (1st Cir. 2009); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

options] lost money." *DeBruyne*, 920 F.2d at 465. To comply with ERISA's fiduciary duty standard, the University need only exercise "prudence, not prescience." *Id.* (quoting *DeBruyne v. Equitable Life Assurance Soc. Of the U.S.,* 720 F. Supp. 1342, 1349 (N.D. Ill. 1989)).

While the Complaint outlines a process that Plaintiffs allege would have been prudent, Compl. ¶¶ 113, 117, it does not even allege that this process was not followed. Instead, Plaintiffs focus solely on the investment results for two options. Plaintiffs' failure-to-monitor claims rely entirely on the "facts" that the CREF Stock Account and TIAA Real Estate Account did not perform as well as other investments. Plaintiffs allege that the CREF Stock Account "has persistently performed worse, over a period of many years, than available lower-cost index [mutual] funds and the index benchmark," Compl. ¶ 57, which would have led a prudent fiduciary to remove it from the plans' investment options, *id.* ¶ 64. The Complaint makes the same argument regarding the TIAA Real Estate Account, whose allegedly poor performance and retention as an investment option, Plaintiffs' argue, is proof that "Defendant failed to conduct . . . a [prudent] process" for monitoring the plans' investment options. Compl. ¶ 76. That is exactly the type of after-the-fact second-guessing that courts have disapproved. *DeBruyne*, 920 F.2d at 465 ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money; such a pronouncement would convert the Balanced Fund into an account with a guaranteed return and would immunize plaintiffs from assuming any of the risk of loss associated with their investment.").[11]

---

[11] *See also St. Vincent*, 712 F.3d at 716 ("'We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight.'" (quoting *In re Citigroup, ERISA Litig.,* 662 F.3d 128, 140 (2d Cir. 2011))); *White*, 2016 WL 4502808, at *8 ("[P]laintiffs' focus on the relative performance of stable value and money market funds over the last six years is an improper hindsight-based challenge to the Plan fiduciaries' investment decision-making.").

16

Moreover, in addition to procedural prudence, facts of which this Court can take judicial notice prove that the University's conduct met the substantive prudence standards as well. Under ERISA, a fiduciary is required to act "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In other words, the test of prudence is what other similarly situated fiduciaries did. But there is no reason to believe that a university fiduciary would have removed either of the two challenged investment options. TIAA is one of the leading providers of services to university and non-profit 403(b) plans. Ex. E, at 2. Publicly-available data and documents cited in the Complaint shows that the two challenged options were routinely selected by such plan fiduciaries as investment options. As of March 31, 2017, the CREF Stock Account held $117.80 *billion* in assets, and the TIAA Real Estate Account held $24.6 *billion*. Ex. J, at 1; Ex. L, at 1. These figures render it completely implausible that the University was imprudent for retaining these two extremely popular investment options.

Moreover, even if the Court were inclined to take Plaintiffs' suggestion to look solely at results, the investment performance of the two options likewise renders Plaintiffs' claims implausible. Both investment options appreciated dramatically over the relevant time period and performed well relative to their stated benchmarks.

The CREF Stock Account, for example, averaged 10.05% annualized returns over the last five years, and has averaged 9.79% returns since it was created. Ex. J, at 1. Over the same five-year period, the account's benchmark, which consists of a weighted average of the Russell 3000® Index and the MSCI All Country World ex USA Investable Market Index, did only marginally better, appreciating only 0.58% more than the CREF Stock Account. *Id.*

The same is true of the TIAA Real Estate Account. Over the last five years, the TIAA Real Estate Account has averaged 8.58% annualized returns,[12] and has annualized returns of 6.42% since it was created. Ex. L, at 1. And, even measured against Plaintiffs' preferred benchmark, the TIAA Real Estate Account performed well against Vanguard REIT Index beating its returns in three of the last six years. *Compare* Ex. K, at 11 *with* Ex. N, at 4 – *Vanguard REIT Index Fund Summary Prospectus* (May 25, 2017).[13] Documents cited in the Complaint further undermine the notion that the TIAA Real Estate Account was imprudent. The Complaint cites a 2012 Aon Hewitt report relating to the University of Nevada that, while critical of the CREF Stock Account, recommended *buying* the TIAA Real Estate Account and gave the underlying investments its highest rating of 4 out of 4. Ex. M, at 1 – Aon Hewitt, InBrief, *TIAA-CREF Asset Management* (July 2012) (cited in Compl. ¶ 62 n.6). Plaintiffs offer no reason to believe that removal of the TIAA Real Estate Account would have been appropriate.

The Complaint is only able to portray these two investment options as underperformers by making two erroneous apples-to-oranges comparisons. First, the Complaint does not compare the CREF Stock Account to its stated benchmark, which is a weighted average of the Russell 3000® Index and the MSCI All Country World ex USA Investable Market Index; instead, the Complaint compares it to only one of those indices (the Russell 3000®), and then alleges that the CREF Stock Account underperformed that index. Compl. ¶ 57. But, as noted above, the CREF Stock Account

---

[12] According to the prospectus cited in the Complaint, the account's performance was even better—it appreciated 9.03% over the last five years. *See* note 5, *supra*.

[13] The two funds' performance over the last six years was as follows:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| TIAA Real Estate | **12.99%** | 10.06% | **9.65%** | 12.22% | **8.16%** | 5.20% |
| Vanguard REIT Index (Inst.) | 8.70% | **17.65%** | 2.48% | **30.28%** | 2.45% | **8.51%** |

performed well compared to its stated benchmark over the last five years: the CREF Stock Account appreciated 10.05% over that time, while its benchmark appreciated 10.63%. This slight difference is hardly the basis for an imprudence claim.

Second, the Complaint compares the performance of these two variable annuity investment accounts, the CREF Stock Account and TIAA Real Estate Account, to mutual funds. *Id*. ¶¶ 57 & 68. As explained above, mutual funds and variable annuity accounts have different features and cost structures. That is why the Aon Hewitt report cited in the Complaint cautions that its recommendations "are provided without consideration of any annuity contract provisions or guarantees," which "may impact [a plan's] best course with regard to this investment and potentially other investments with TIAA." Ex. M, at 5. Plaintiffs then compound this error by comparing the performance of these two investment vehicles *net of fees*. Compl. ¶¶ 54–56. As noted above, an annuity investment option offers more services but also higher fees which would account for a slightly lower performance on a net-of-fees basis. Such inapt comparisons do nothing to make Plaintiffs' failure-to-monitor claims plausible.

Ultimately, the failure-to-monitor claims, like the excessive-fees claims, must be dismissed. The Complaint contains no factual allegations suggesting that the University's process for monitoring investment choices is flawed (indeed, it does not even allege what that process is). Instead, Plaintiffs rely entirely on their incorrect assertion that CREF Stock Account and TIAA Real Estate Account were underperformers. Those investments actually appreciated significantly over the relevant time period, but even if that weren't true it cannot save Plaintiffs' claims since the University cannot be faulted for maintaining as investment options accounts that were chosen by many other fiduciaries.

19

**B. Plaintiffs Have Not Plausibly Alleged that the University Breached the Duty of Loyalty (Counts I, II, and III).**

In Counts I, II, and III, the Complaint also alleges that the University breached a separate duty of loyalty to act in the best interests of the plans. *See* Compl. ¶¶ 103–115. The Court should dismiss those claims too, as they are not distinct from the duty-of-prudence claims and are similarly implausible or baseless.

*First*, Plaintiffs do not include a single factual allegation that suggests the University was disloyal—*i.e.*, that it acted with anything but "an eye single to the interests of the participants and beneficiaries." *Donovan v. Beirwirth*, 680 F.2d 263, 271 (2d Cir. 1982); *Heath v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir. 1995). There is "no authority in support of the proposition that causing an ERISA Plan to incur unreasonable expenses is a breach of the duty of loyalty, distinct from a breach of the duty of prudence." *White*, 2016 WL 4502808, at *4. To allege a breach of the duty of loyalty, Plaintiffs must do more than simply "allege[] that [the University] violated the 'duties of loyalty and prudence.'" *Id*. To be sure, Plaintiffs make passing references to what a "prudent and loyal fiduciary" should have done with respect to the Plans, *e.g*., Compl. ¶ 108, but Plaintiffs "allege no facts from which disloyalty can be inferred," *White*, 2016 WL 4502808, at *4.[14] The Court should dismiss the duty-of-loyalty claims for that reason alone.

*Second*, TIAA's non-profit status and Vanguard's unique structure make Plaintiffs' disloyalty claims wholly implausible. TIAA has operated as a not-for-profit entity for the entire period at issue, and much longer than that. Ex. E, at 1. Although Vanguard is structured differently, it still operates "at cost" because it has no third-party owners; Vanguard's subsidiary mutual funds

---

[14] *Accord Loomis*, 658 F.3d at 671; *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 838 (N.D. Cal. 2005); *Romero v. Nokia*, No. C 12-6260 PJH, 2013 WL 56923234, at *5 (N.D. Cal. Oct. 15, 2013) (dismissing duty of loyalty claim because plaintiff's "theory 'hinges entirely' on prudence-based allegations").

own 100% of the interest in Vanguard, and individual investors, in turn, own the mutual funds. Ex. F, at 1. This structure aligns Vanguard's interests with those of its investors, making it implausible that the University would have put Vanguard's interests above those of participants or beneficiaries. Given these facts, and the fact that Plaintiffs have not included a single factual allegation related to the duty-of-loyalty claims, there is no basis to infer that the University "discharged [its] duties with anything other than complete loyalty as required by § 1104(a)(1)(A)." *White*, 2016 WL 4502808, at *4.

For these reasons, the Court should dismiss Plaintiffs duty-of-loyalty claims.

### C.    Plaintiffs Have Not Plausibly Alleged that the University Caused the Plans to Engage in Prohibited Transactions (Counts IV and V).

Counts IV and V attack the plans' participant loan program, which TIAA administers. As noted above, there is no standing to assert these claims, because neither participant alleges that they took out any loans. *See* Part I, *supra*. But even assuming *arguendo* that they had standing, neither of their two counts directed at the program has merit.

#### 1.    Count IV.

In Count IV, Plaintiffs contend that the University violated § 1106(a)(1)(B), which prohibits fiduciaries from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(B). It is unclear from the Complaint exactly how Plaintiffs contend the University violated this provision. Paragraph 125 alleges that the violation was approving a loan program that did not qualify for the regulatory exemption from the prohibited transaction rules. But Plaintiffs do not allege why this is so. Plaintiffs appear to be contending that the fact that TIAA receives compensation for offering loans

(by keeping part of the interest rate participants pay) means that the loan program is "intended to benefit TIAA, a party in interest to the Plans, at the expense of Plaintiff." Compl. ¶ 124; *see also id*. ¶ 86.

Whatever Plaintiffs' theory, this claim has no merit. Plaintiffs concede that ERISA contains a specific exemption from the prohibited transaction rules for participant loan programs. Compl. ¶ 125. The statute and the implementing regulation both provide that loans "made by the plan to . . . participants or beneficiaries of the plan" are exempt from § 1106's prohibition if the loans meet five requirements. 29 U.S.C. § 1108(b)(1); 29 C.F.R. § 2550.408b-1. Three of the five requirements are not even arguably at issue: there is no allegation that (i) loans are not available to all participants on a reasonably equivalent basis, (ii) highly compensated employees are eligible for larger loans, or (iii) that loans are not made in accordance with the provisions of the plan. 29 U.S.C. § 1108(b)(1)(A)–(C). And as to the other requirements, which are alluded to in the Complaint, there are no allegations sufficient to state a claim.

One requirement is that loans "bear a reasonable rate of interest." *Id*. § 1108(b)(1)(D). The Complaint does not allege any facts from which the Court could infer that the interest rate charged to participants is unreasonable. A rate is considered reasonable if it "provides the plan with a return commensurate with the interest rates charged by persons in the business of lending money for loans which would be made under similar circumstances." 29 C.F.R. § 2550.408b-1(e). But the Complaint does not even allege the interest rate on loans or describe how the interest rate on loans is set (and neither Plaintiff alleges that they even took out loans). The six paragraphs devoted to a discussion of the loan program provide no basis to infer that the interest rate on loans is unreasonable. Compl. ¶¶ 84–89.

Plaintiffs appear to suggest that the § 1108(b)(1) exemption does not apply because the loan is not made "by a plan." Compl. ¶ 84. That claim is meritless, but even if it were accepted as true, there is a separate exemption that applies. Section 1108(b)(17) applies to transactions governed by § 1106(a)(1)(B) and (D) between the plan and a party-in-interest like TIAA, and provides that such transactions are exempt from the prohibited-transaction rules provided that the party-in-interest is paid no more than "adequate consideration." 29 U.S.C. § 1108(b)(17). Plaintiffs do not dispute that TIAA is entitled to compensation for operating the participant loan program, and they do not allege why any compensation TIAA earned was excessive.

Plaintiffs allege that, as part of the loan program, TIAA "will earn the spread between the interest rate charged to the participant for the loan and the interest paid by TIAA to the plan participant through the Traditional Annuity or the Retirement Loan certificate." Compl. ¶ 132. That is not a reason to infer that the program is designed to benefit TIAA, rather than plan participants. The loans allow participants to use funds ordinarily available only when they reach retirement age. Administering that program involves costs since someone must issue account statements, process payments, and the like. There is no suggestion that the spread TIAA earns (however much that is) is more than adequate consideration for the costs associated with the program.[15] The compensation TIAA earns therefore is exempt under § 1108(b)(17), and Plaintiffs' claims that the loan program constitutes a prohibited transaction under ERISA simply because TIAA receives its compensation in the form of an unspecified amount of spread fails to state a claim for relief.

---

[15] Plaintiff points out that the Charles Schwab has a standardized loan policy for 401(k) plans, Compl. ¶ 81, but the Complaint does not list the fees that Schwab charges for such loans, or how those fees would compare to the amounts a participant pays through the TIAA loan program.

23

### 2. Count V.

In Count V, Plaintiffs complain that participants must transfer assets from their accounts to the TIAA Traditional Annuity as security for the loan, which they allege violates ERISA's prohibition on the transfer of assets to parties-in-interest. Compl. ¶¶ 127–33 (relying on 29 U.S.C. § 1106(a)(1)(D)). But Count V fails for similar reasons.

The concern on which that claim is based—that participants must transfer their assets to the TIAA Traditional Annuity (which is itself one of the investment options in the plans) as security to obtain a loan—is actually *required* by ERISA, not a defect in the loan program's design. As noted above, ERISA exempts participant loans from the prohibited-transaction rules if certain requirements are met. One of those requirements is that loans must be "adequately secured." 29 U.S.C. § 1108(b)(1)(E). This requirement is designed to ensure that "loss of principal or interest will not result from the loan." 29 C.F.R. § 2550.408b-1(f)(1). ERISA therefore requires Plaintiffs to pledge security sufficient to ensure that the plan is not harmed in the event the participant defaults on their loans.

Plaintiffs claim that the transfer of 110% of the loan amount to the TIAA Traditional Annuity as security for the loan actually constitutes a violation of ERISA, even though the statute and regulation makes clear that adequate security is required. *See id*. ("A loan will be considered to be adequately secured if the security posted for such loan is something . . ., the value and liquidity of which . . . is such that it may reasonably be anticipated that loss of principal or interest will not result from the loan."). The Complaint nowhere explains why the 110% requirement somehow violates the exemption's requirement that loans be adequately secured. The statutory scheme would make no sense if, by complying with one of the exemptions to § 1106 contained in

§ 1108, the University simultaneously could be held liable for violating § 1106. Count V therefore fails to state a claim as well.

## III.  THE COURT SHOULD STRIKE PLAINTIFFS' JURY DEMAND

The Complaint demands a jury trial, but Plaintiffs have no right to a jury trial under ERISA, so the jury demand should be stricken. Since at least 1980, the settled law in this Circuit is that ERISA does not provide parties with the right to trials by jury. *E.g.*, *Wardell v. Cent. States, Se. & Sw. Area Pensions Fund*, 627 F.2d 820, 829–30 (7th Cir. 1980).[16] The Seventh Amendment preserves jury trials only for "Suits at common law." U.S. Const. amend. VII. "ERISA's antecedents are equitable," and so "there is no right to a jury trial in an ERISA case." *Mathews*, 144 F.3d at 468. That is true regardless whether Plaintiffs suit arises under either 29 U.S.C. § 1132(a)(1) or (a)(2); courts hold that there is no right to a jury trial under either provision. *George v. Kraft Foods Glob., Inc.*, Nos. 07 C 1713, 07 C 1954, 2008 WL 780629, at *2 (N.D. Ill. Mar. 20, 2008). Accordingly, the Court should strike Plaintiffs' jury demand under Rule 12(f).[17]

## CONCLUSION

For the reasons stated above, the University requests that the Court dismiss Plaintiffs' claims related to CRP and the participant loan program for lack of subject matter jurisdiction under Rule 12(b)(1), dismiss the Complaint entirely for failure to state a claim under Rule 12(b)(6), and, if any portion of the Complaint survives, to strike the Complaint's jury demand under Rule 12(f).

---

[16] *See also Patton v. MFS/SON Life Fin. Distributions, Inc.*, 480 F.3d 478, 484 (7th Cir. 2007); *Matthews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998); *Plummet v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 863 (7th Cir. 1997).

[17] *See Spano v. Boeing Co.*, No. 06-CV-743-DRH, 2007 WL 1149192, at *6 (S.D. Ill. Apr. 18, 2007) (noting that "Rule 12(f) is commonly employed in this Circuit to strike a plaintiff's demand for a jury trial where as a matter of law the Plaintiff has no right to a jury trial."); *Cabin v. Plastofilm Indus., Inc.*, No. 96-CV-2564, 1996 WL 496604, at *1 & n.1, *3–4 (N.D. Ill. Aug. 29, 1996) (striking a jury demand as to ERISA claims under Rule 12(f)) (Castillo, J.).

Dated:  July 18, 2017                                    Respectfully submitted,


By: */s/Mark B. Blocker*
    Anne E. Rea
    Mark B. Blocker
    Benjamin I. Friedman
    SIDLEY AUSTIN LLP
    One South Dearborn Street
    Chicago, Illinois 60603
    (312) 853-7000
    312) 853 7063 (Fax)

    *Attorneys for The University of Chicago.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2017, I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, Eastern Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.


*/s/Mark B. Blocker*
Mark B. Blocker